UNITED STATES DISTRICT COURT                    O
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

JESUS NATIVIDAD SANTOS-      §
SANCHEZ                             §
                                  §
        Petitioner           §
v.                              §    CIVIL ACTION NO. 5:06-cv-153
                                  §

UNITED STATES OF AMERICA

## OPINION AND ORDER

Pending before the Court is Jesus Natividad Santos-Sanchez' ("Santos-Sanchez") "Petition for a Writ of Coram Nobis."[1]   After considering the petition, record and controlling authorities, the Court **DENIES** the petition.

## I.      BACKROUND

On September 6, 2003, Santos-Sanchez was charged with aiding and abetting the illegal entry of a Mexican alien by attempting to transport him to further his entry into the United States.[2]  Santos-Sanchez pleaded guilty to the charge (a misdemeanor) and was placed on a one year period of probation.[3]  Santos-Sanchez did not appeal either his conviction or sentence.  At the time of his plea and conviction, Santos-Sanchez was a resident alien and had been so since 2001.[4]  Santos-Sanchez successfully completed his term of probation.

In November 2004, Santos-Sanchez appeared before an immigration court in connection with a removal proceeding.  The immigration judge terminated the removal proceeding finding

---

[1] Dkt. No. 1. ("Dkt. No. refers to the docket number entry for the Court's electronic filing system.  The Court will cite to the docket number entries rather than the title of each filing.  Unless stated otherwise, "Dkt. No." will be used to refer to filings in the civil case number 5:06-cv-153.  "Cr. Dkt. No." will be used to refer to filings in criminal case number 5:03-mj-4618-1).
[2] Cr. Dkt. No. 1.
[3] Cr. Dkt. No. 2.
[4] Dkt. No. 1.

that Santos-Sanchez was not removable.[5]  The Department of Homeland Security appealed the case.[6]  On April 25, 2006, the Board of Immigration Appeals sustained the government's appeal and remanded the case for further proceedings.[7]

On September 12, 2006, Santos-Sanchez filed this petition for writ of *coram nobis*.  The case was initially heard by the magistrate judge who had presided over the misdemeanor case.  That court determined that it had jurisdiction to consider the petition as it was an attack on that court's judgment.  The magistrate judge granted the writ.[8]  The United States then filed in this Court a notice of appeal and motion to strike the magistrate judge's ruling.[9]  This Court determined that the magistrate judge was without jurisdiction to hear the petition and thus vacated the magistrate judge's ruling.[10]  This Court subsequently denied the writ.

Santos-Sanchez timely appealed the denial of the writ.  On November 6, 2008, the Fifth Circuit affirmed the judgment of this Court.[11]  The Fifth Circuit specifically held that Santos-Sanchez' claim, that he suffered ineffective assistance of counsel because his counsel failed to advise him of the immigration consequences of his plea, was foreclosed by *United States v. Banda*.[12]

Santos-Sanchez thereafter filed a petition for writ of certiorari.  While Santos-Sanchez' petition was pending, the Supreme decided *Padilla v. Kentucky*,[13] which held "that counsel must

---

[5] Dkt. No. 1, Attach. 8.
[6] *Id.*
[7] *Id.*
[8] Dkt. No. 6.
[9] Dkt. Nos. 7 & 8.
[10] Dkt. No. 9.
[11] Santos-Sanchez v. United States, 548 F.3d 327 (5th Cir. 2008) (*abrogated by* Padilla v. Kentucky, 130 S. Ct. 1473 (2010)).
[12] *Id.* at 334-336 (citing United States v. Banda, 1 F.3d 354 (5th Cir. 1993) (*abrogated by* Padilla v. Kentucky, 130 S. Ct. 1473 (2010)).
[13] 130 S. Ct. 1473 (2010).

inform her client whether his plea carries a risk of deportation."[14]  Santos-Sanchez' case was thus remanded to the Fifth Circuit Court of Appeals, which in turn remanded the case to this Court for further proceedings consistent with *Padilla*.[15]  This Court once again considers the merits of Santos-Sanchez' petition for writ of *coram nobis*.

## II.    RETROACTIVITY ANALYSIS

This first issue before the Court is whether *Padilla v. Kentucky*,[16] should receive retroactive application to federal convictions on collateral review—thus enabling the Court to consider the merits of Santos-Sanchez' *Padilla* claim.

This inquiry begins with *Padilla* itself.  Had the Supreme Court explicitly held that *Padilla* was retroactive, the analysis would be complete.  Unfortunately, the Supreme Court did not specify whether *Padilla* should be applied retroactively to cases on collateral review.[17]  Some courts examining the retroactivity of *Padilla*, have suggested the majority's dismissal of the "floodgates" concern indicates that *Padilla* should be applied retroactively.[18]  This Court is not convinced.  That "floodgates" passage states in part:

> It seems unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains.  For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea.[19]

The Court acknowledges that this portion of the opinion leaves the door open to retroactive application of *Padilla*, but it stops far short of *ordering* that the rule be applied retroactively.  Furthermore, as *dicta*, this passage is not binding upon this Court.   Finally, even if this passage

---

[14] *Id.* at 1486.
[15] Dkt. No. 40.
[16] 130 S. Ct. 1473 (2010).
[17] Dennis v. United States, C/A No. 3:08-cr-889, 2011 WL 1480398, *2 (D.S.C., Apr. 19, 2011).
[18] United States v. Chaidez, 730 F. Supp. 2d 896, 903 (N.D. Ill., 2010) (quoting United States v. Hubenig, No. 6:03-mj-40, 2010 WL 2650625, at *7 (E.D. Cal., July 1, 2010)).
[19] Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010).

suggests that *Padilla* should be applied retroactively, the Court believes that the dominant retroactivity test, *Teague v. Lane*,[20] does a poor job of accounting for this outcome.

### A. Whether *Teague v. Lane* Should be Applied to Federal Convictions on Collateral Review

After reviewing many cases wrestling with the retroactivity of *Padilla*, it appears that the most common approach is to apply the *Teague v. Lane* retroactivity analysis. This Court, however, believes that the applicability of *Teague* to federal convictions on collateral review is highly questionable.[21] Therefore, the Court will voice its concerns regarding this approach before explaining why it is, nevertheless, applying the *Teague* analysis in this case. It is easier to understand *Teague* and its arguably limited role if it is placed in the proper historical context.

In *Danforth v. Minnesota*,[22] the Supreme Court provided a veritable primer on retroactivity analyses and focused on *Teague* in particular. The Supreme Court began by explaining that the retroactivity analyses grew out of the incorporation era when various portions of the Bill of Rights were being applied to the states for the first time.[23] Initially, during the era of incorporation, "'[n]ew' constitutional rules of criminal procedure were, without discussion or analysis, routinely applied to cases on habeas review."[24] The Supreme Court first addressed the issue of retroactivity directly in the 1965 case *Linkletter v. Walker*.[25] But the approach adopted in *Linkletter* was fraught with problems,[26] and ultimately, in *Teague v. Lane*, "Justice O'Connor endorsed a general rule of nonretroactivity for cases on collateral review . . . ."[27]

---

[20] 489 U.S. 288 (1989) (plurality opinion).

[21] In 2007, the Supreme Court declined to hear a case where the petitioner argued that *Teague* was inapplicable in the 28 U.S.C. § 2255 context. *See*, Soto v. United States, 552 U.S. 952 (2007); Petition for Writ of Certiorari Soto v. United States, 552 U.S. 952 (2007) (No. 07-327) 2007 WL 2688257.

[22] 552 U.S. 264 (2008).

[23] *Id.* at 272-273 (citations omitted).

[24] *Id.* (citations omitted).

[25] *Id.* at 273 (citing Linkletter v. Walker, 381 U.S. 618 (1965)).

[26] *Id.* at 273-274.

[27] *Id.* at 274-275 (citing Teague v. Lane, 489 U.S. 288, 310-313 (1989) (plurality opinion)).

Further, the Supreme Court stated in *Danforth*, "[i]t is thus abundantly clear that the *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings."[28]   Interestingly, "[O'Conner] justified the general rule of nonretroactivity in part by reference to comity and respect for the finality of state convictions.  Federalism and comity considerations are unique to *federal* habeas review of state convictions."[29]   Based on the Supreme Court's characterization of *Teague* as a creature of incorporation that was partially constructed to handle issues of federalism and comity, this Court has serious doubts whether it should be applied to *federal convictions* on collateral review.  If *Teague* is applicable to collateral review of federal convictions, the rationale for applying such a test is significantly less compelling when reviewing federal convictions as opposed to reviewing state convictions.[30]   Ultimately, the finality of judgments and uniformity are the primary arguments that support applying *Teague* to federal convictions.[31]

The fact that neither the history leading up to *Teague* nor much of the rationale underlying that decision support application of the *Teague* analysis to federal convictions on collateral review, may explain why the Supreme Court *has never applied Teague in the context of a § 2255.*  In *Danforth*, the Supreme Court stated, "[w]e note at the outset that this case does not present [the question of] . . . whether the *Teague* rule applies to cases brought under 28 U.S.C. § 2255 . . . we express no opinion on [this issue]."[32]   Accordingly, this Court has strong reservations about applying *Teague* in the context of any collateral attack on a federal conviction.  That said, the Fifth Circuit has applied *Teague* to a § 2255.[33]   Thus, this Court will

---

[28] *Id.* at 280.
[29] *Id.* at 279 (citing State v. Preciose, 609 A.2d 1280, 1292 (N.J. 1992)) (emphasis added).
[30] *Cf.* Petition for Writ of Certiorari Soto v. United States, 552 U.S. 952 (2007) (No. 07-327) 2007 WL 2688257.
[31] Danforth, 552 U.S. at 279-280.
[32] *Id.* at 269 n. 4 (2008); *but see id.* at 281 n. 16 (explaining that "[m]uch of the reasoning applicable to . . . § 2254 [motions] seems equally applicable in the context of § 2255 motions.").
[33] *See* United States v. Brown, 305 F.3d 304, 306-307 (5th Cir. 2002).

follow the direction of the Fifth Circuit and apply *Teague* to Santos-Sanchez' collateral attack on his federal conviction.

**B.      The *Teague* Analysis**

It is incontrovertible that if *Padilla* is analyzed under *Teague*, it must be applied retroactively to cases on collateral review. "Under the *Teague* framework, an old rule applies both on direct and collateral review...."[34]   On the other hand, new rules do not apply retroactively to cases on collateral review, unless either of two exceptions applies.[35]   The Supreme Court declared in *Danforth* that "'[u]nder *Teague*, new rules will not be applied or ***announced in cases on collateral review unless they fall into one of two exceptions***.'"[36] *Graham v. Collins*[37] demonstrates that when a case is on collateral review and the holding sought by the defendant would announce a new rule that does not fit a *Teague* exception, the Supreme Court will *refuse to apply or announce the rule in that case*.[38]   *Padilla* was before the Supreme Court *on collateral review* and the Supreme Court's *holding (rule) was applied* to Padilla.[39] Therefore, when *Teague* is applied to *Padilla* there are three possible outcomes: (1) *Padilla* announced an old rule; (2) *Padilla* announced a new rule and the first *Teague* exception applies, or (3) *Padilla* announced a new rule and the second *Teague* exception applies.[40]   The Court will flesh out these concepts below, but it is critical to understand that each of the three available options results in the retroactive application of *Padilla* to cases on collateral review.   Therefore, the Court will reach the merits of Santos-Sanchez' *Padilla* claim.

---

[34] Whorton v. Bocketing, 549 U.S. 406, 416 (2007) (citing Griffith v. Kentucky, 479 U.S. 314 (1987)).
[35] *Id.* (citing Saffle v. Parks, 494 U.S. 484, 495 (1990)).
[36] Danforth v. Minnesota, 552 U.S. 264, 266 n. 1 (2008) (quoting Penry v. Lynaugh, 492 U.S. 302, 313 (1989), *abrogated on other grounds by* Atkins v. Virginia, 536 U.S. 304 (2002)) (emphasis added).
[37] 506 U.S. 461 (1993).
[38] *Id.* at 463, 477-478.
[39] Padilla v. Kentucky, 130 S. Ct. 1473 (2010).
[40] *Cf.* United States v. Chaidez, 730 F. Supp. 2d 896, 902-903 (N.D. Ill. 2010).

Although it is clear that *Padilla* must be applied retroactively under *Teague*, the Court will conduct a full *Teague* analysis in order to illustrate that *Teague* does a poor job of accounting for the outcome in *Padilla*.    Ultimately, the Court is left to speculate whether the Supreme Court entirely disregarded *Teague* in its analysis of *Padilla*.  With those observations in mind, the Court turns to the *Teague* analysis.

In order to properly classify a holding as either a "new" rule or an "old" rule pursuant to *Teague*, the Supreme Court provided the following three-step inquiry:

> First, the date on which the defendant's conviction became final is determined. Next, the habeas court considers whether "a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution."  If not, then the rule is new. If the rule is determined to be new, the final step in the *Teague* analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine.[41]

Although the above inquiry handles many situations, the Supreme Court has given further instruction for those situations when a Court determines that a rule is an "old rule" because the analysis necessarily diverges at that point.

> If, however, the decision did not announce a new rule, it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent.  The interests in finality, predictability, and comity underlying our new rule jurisprudence may be undermined to an equal degree by the invocation of a rule that was not dictated by precedent as by the application of an old rule in a manner that was not dictated by precedent.[42]

Therefore, the Court's analysis will diverge based on whether it finds that *Padilla* announced a new rule or an old rule under *Teague*.

---

[41] O'Dell v. Netherland, 521 U.S. 151, 156-157 (1997) (quoting Lambrix v. Singletary, 520 U.S. 518 527 (1997)).
[42] Stringer v. Black, 503 U.S. 222, 228 (1992) (citing Butler v. McKellar, 494 U.S. 407, 414-415 (1990)).

### i.    The Date Santos-Sanchez' Conviction Became Final

The Court begins the *Teague* analysis by determining when Santos-Sanchez' conviction became final.   Santos-Sanchez pleaded guilty to aiding and abetting the illegal entry of an illegal alien on September 8, 2003.[43]   Judgment was entered on September 8, 2003.[44]   Because Santos-Sanchez did not appeal, his conviction became final ten days later (excluding weekends and holidays) on September 22, 2003.[45]

### ii.    New Rule/Old Rule Analysis

Next the Court must determine whether *Teague* announced a new rule or an old rule.   In making this determination, the Court found it very helpful to review several prior cases where the Supreme Court has expounded on the *Teague* analysis.   Therefore the Court will begin with a brief review of *Teague* and its progeny.

### a.    Review of Prior *Teague* Analyses

In *Teague v. Lane*, the Supreme Court set out a test for determining whether freshly announced rules of criminal procedure would apply in collateral attacks on state convictions that were already final at the time the rule was recognized.   In *Danforth*, the Supreme Court reflected upon the retroactivity analysis in this particularly enlightening passage:

> Thus, our opinion in *Crawford* announced a "new rule"—as that term is defined in *Teague*—because the result in that case "was not *dictated* by precedent existing at the time the defendant's conviction became final."   It was not, however, a rule "of our own devising" or the product of our own views about sound policy. . . .
> Our decision today must also be understood against the backdrop of our somewhat confused and confusing "retroactivity" cases decided in the years between 1965 and 1987.   Indeed, we note at the outset that ***the very word "retroactivity" is misleading*** because it speaks in temporal terms.   "Retroactivity" suggests that when we declare that a new constitutional rule of criminal procedure is "nonretroactive," ***we are implying that the right at issue was not in existence***

---

[43] 5:03-mj-4618, Dkt. No. 2.
[44] *Id.*
[45] Fᴇᴅ. R. Cʀɪᴍ. P. 58(g)(2)(B) (amended 2010).

*prior to the date the "new rule" was announced. But this is incorrect.* As we have already explained, *the source of a "new rule" is the Constitution itself*, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule. What we are actually determining when we assess the "retroactivity" of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought.[46]

*Danforth* highlights several critical themes that underlie the *Teague* analysis. First, the Supreme Court does not invent new rules, but instead pronounces standards required by the Constitution. Since both "new rules" and "old rules" exist *before* the Supreme Court announces them, the Supreme Court will necessarily cite legal authority in support of all newly articulated constitutional rights.[47]   Second, since the rights in question preexist the Supreme Court's articulation of those rights, the presumption underlying a *Teague* analysis is that those who suffered violations of constitutional rules of criminal procedure that were articulated after their convictions became final, nevertheless, suffered constitutional violations. Therefore, the term "retroactive" is a misnomer because the question is really one of "redressability."[48]   Third, *Danforth* reaffirms that the heart of the *Teague* "new rule" inquiry is whether a rule was "dictated by precedent existing at the time the defendant's conviction became final."

In the wake of *Teague*, the Supreme Court has regularly considered whether various changes constitute new rules of criminal procedure. Importantly, the themes highlighted in *Danforth* and related themes may be traced through the Supreme Court's multitude of *Teague* analyses.

---

[46] Danforth v. Minnesota, 552 U.S. 264, 270-271 (2008) (citing Crawford v. Washington, 541 U.S. 36 (2004); Teague v. Lane, 489 U.S. 288, 301 (1989) (plurality opinion)) (emphasis added).
[47] *See* Sawyer v. Smith, 497 U.S. 227, 235-237 (1990).
[48] Danforth, 552 U.S. at 271 n. 5.

In *Saffle v. Parks*,[49] the Supreme Court acknowledged that "[t]he explicit overruling of an earlier holding no doubt creates a new rule; it is more difficult, however, to determine whether we announce a new rule when a decision extends the reasoning of our prior cases."[50] The Supreme Court further explained, "our task is to determine whether a state court considering [Defendant's] claim at the time his conviction became final would have felt *compelled by existing precedent* to conclude that the rule [Defendant] seeks was required by the Constitution."[51] The Supreme Court further fleshed out this principle in *Graham v. Collins*,[52] stating, "[t]hus, unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so now."[53]

Furthermore, in *Butler v. McKellar*,[54] the Supreme Court made it clear that a court may rely heavily on existing precedent, and the rule announced by the court would still be a "new rule" for *Teague* purposes.

> But the fact that a court says that its decision is within the "logical compass" of an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under *Teague*. Courts frequently view their decisions as being "controlled" or "governed" by prior opinions even when aware of reasonable contrary conclusions reached by other courts. In *Roberson*, for instance, the Court found *Edwards* controlling but acknowledged a significant difference of opinion on the part of several lower courts that had considered the question previously.[55]

---

[49] 494 U.S. 484 (1990).
[50] *Id.* at 488.
[51] *Id.* (emphasis added).
[52] 506 U.S. 461 (1993).
[53] *Id.* at 467 (quoting Saffle v.Parks, 494 U.S. 484, 488 (1990).
[54] 494 U.S. 407 (1990).
[55] *Id.* at 415.

Therefore, mere reliance on existing precedent is insufficient to render a decision an "old rule." The "legal landscape"[56] must be such that "reasonable jurists . . . 'would have felt compelled by existing precedent'" to reach a specific conclusion.[57]

In light of these cases, the Court finds it useful to view the *Teague* analysis as a spectrum. Along the spectrum are cases that articulate various constitutional rules of criminal procedure. Without exception, these cases rely upon the Constitution directly or cases interpreting it for their holdings. On one end are cases that find general support in prior precedent. These cases articulate "new rules," and if no exception applies, defendants whose cases became final before the articulation of the "new rules" will be unable to seek redress ***even if their constitutional rights were, in fact, violated***. But towards the other end of the spectrum, are cases whose holdings are increasingly supported by more specific and clearly applicable precedent. Eventually, there is a point along the spectrum where the cases announce results that "reasonable jurists" would agree were "dictated by precedent." These cases articulate "old rules." Defendants whose cases became final before an "old rule" was articulated are nevertheless permitted to launch collateral attacks based on that fresh holding.

Conveniently, in determining where a given case falls on the above spectrum, the Supreme Court has provided some direction. Specifically, the Supreme Court has indicated that the presence of a dissenting opinion in a case may signal that a rule is not one that is compelled by precedent.[58] Further, the Supreme Court has considered circuit court opinions reaching a different result to be evidence that reasonable jurists could differ.[59]

---

[56] *See* Graham, 506 U.S. at 468.
[57] *Id.* at 467 (citing Saffle v. Parks, 494 U.S. 484, 488 (1990)).
[58] *See* Beard v. Banks, 542 U.S. 406, 414-416 (2004).
[59] *See* Butler v. McKellar, 494 U.S. 407, 415 (1990).

### b. *Teague* Applied

Here the Court must determine whether a reasonable jurist at the time Santos-Sanchez'

conviction became final would have felt compelled by then existing precedent to reach the result

that was ultimately reached in *Padilla*. Because little changed legally in the years between

Santos-Sanchez' conviction becoming final and the Supreme Court issuing its opinion in *Padilla*,

the Court will actually consider the "legal landscape" as it existed when *Padilla* was decided.

The Supreme Court's analysis of *Caldwell v. Mississippi*[60] in *Sawyer v. Smith*[61] is

instructive in analyzing *Padilla*. In *Sawyer* the Supreme Court found that *Caldwell* announced a

new rule.[62] Interestingly, the Supreme Court made it excruciatingly clear that a court may rely

heavily on prior cases without those prior cases constituting precedent that dictates a particular

result.

> Examination of our Eighth Amendment authorities that preceded *Caldwell*
> shows that it was not dictated by prior precedent existing at the time the
> defendant's conviction became final. In *Caldwell* itself we relied on [four cases],
> in support of the result. We cited these decisions for the general proposition that
> capital sentencing must have guarantees of reliability, and must be carried out by
> jurors who would view all of the relevant characteristics of the crime and the
> criminal, and take their task as a serious one. Petitioner, too, cites these and other
> cases in support of the argument that *Caldwell* was "rooted" in the Eighth
> Amendment command of reliable sentencing, and that application of these cases
> to misleading prosecutorial comment "[b]y analogy" would lead to the predictable
> *Caldwell* result . . . .[63]

> We do not doubt that our earlier Eighth Amendment cases lent general
> support to the conclusion reached in *Caldwell*. But neither this fact, nor
> petitioner's contention that state courts "would have found *Caldwell* to be a
> predictable development in Eighth Amendment law," . . . suffices to show that
> *Caldwell* was not a new rule. In petitioner's view, *Caldwell* was dictated by the

---

[60] 472 U.S. 320 (1985).
[61] 497 U.S. 227, 235-236 (1990) (citing Caldwell v. Mississippi, 472 U.S. 320 (1985)).
[62] *Id.* at 234.
[63] *Id.* at 235-236 (citing Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978) (plurality opinion); Gardner v. Florida, 430 U.S. 349 (1977) (plurality opinion); Woodson v. North Carolina, 428 U.S. 280 (1976) (plurality opinion)).

principle of reliability in capital sentencing. But the [*Teague*] test would be meaningless if applied at this level of generality.[64]

The Court notes that this passage is entirely consistent with the Supreme Court's statement from *Butler v. McKellar* that cases may still announce new rules even though they are "controlled," "governed" or fall within the "logical compass" of previous cases. This observation is critical because *Strickland*, the case the majority primarily relied upon in *Padilla*, provides the standard for measuring an attorney's effectiveness, rather than the actual right to effective assistance. Fourteen years before *Strickland* was announced, the Supreme Court acknowledged that "[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel."[65] At best, *Strickland* provides *general support* for the outcome in *Padilla*. This Court recognizes that this view is somewhat controversial, but finds it disingenuous to suggest that *Padilla* is a straight forward application of *Strickland*.[66] While on the surface the two prongs of a *Strickland* violation, objectively unreasonable assistance and prejudice, remain unchanged by *Padilla*, the meaning of the first prong was *radically altered*. Before *Padilla*, every federal circuit court that had considered the issue found that it was not a Sixth Amendment violation to fail to inform a defendant of immigration consequences.[67] Post-*Padilla*, the definition of "unreasonable" has been expanded to include an attorney who fails to educate himself and advise his client of the deportation consequences of the guilty plea. In the view of this Court, this constitutes a major change to *Strickland*.[68]

---

[64] *Id.* at 236 (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987))(emphasis added).

[65] McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970) (citing Reece v. Georgia 350 U.S. 85, 90 (1955); Glasser v. United States, 315 U.S. 60, 69-70 (1942); Avery v. Alabama, 308 U.S. 444, 446 (1940); Powell v. Alabama, 287 U.S. 45, 57 (1932)).

[66] *But see*, United States v. Orocio, 645 F.3d 630, *5 (3rd Cir. 2011).

[67] *See* Padilla, 130 S. Ct. 1473, 1491 (2010) (Alito, J. concurring).

[68] For a similar perspective on how *Padilla* changed *Strickland*, *see,* Dennis v. United States*, C/A No. 3:08-cr-889, 2011 WL 1480398, *4 (D.S.C. Apr. 19, 2011) ("The court believes this finding of the Court makes its decree a new rule, for the Supreme Court has never addressed the issue of whether or not the direct versus collateral consequence is appropriate to use in defining the scope of constitutionally "reasonable professional assistance"

All three opinions in *Padilla* acknowledge that the majority opinion was changing the requirements of reasonable assistance under *Strickland*. Although the majority in *Padilla* rejected the distinction between direct and collateral consequences on the narrow issue of deportation, it is easy to overemphasize the significance of that conclusion.[69] Even though the majority stated that such a distinction was "ill suited" in the deportation context,[70] it would be disingenuous to suggest that the majority did not recognize that deportation was different. The majority merely changed the terminology. Instead of classifying deportation as a "collateral" consequence, the majority characterized deportation as *sui generis*."[71] Yet in a moment of candor, the majority admitted that its holding would "affect the *scope and nature* of counsel's advice."[72] The concurring justices maintained that the direct/collateral distinction was valid;[73] as did the two dissenting justices.[74] Thus, to varying degrees, all nine justices acknowledged that *Padilla's* holding marked a change in what was required of criminal defense counsel.

Additionally, the majority, concurring and dissenting opinions in *Padilla* recognize the significant body of precedent that was contrary to *Padilla's* holding. In discussing the Kentucky Supreme Court's view that a failure to discuss potential deportation was not ineffective assistance of counsel, Justice Stevens wrote for the majority that "[t]he Kentucky high court is far from alone in this view."[75] In his concurrence, Justice Alito put it this way, "[t]he Court tries to justify its *dramatic departure from precedent* by pointing to views of various professional

---

required under *Strickland*. In other words, although the Supreme Court did not overturn any precedent it had established, it did, for the first time, expand the Sixth Amendment right to counsel to cover the immigration implications of a criminal conviction by rejecting several lower courts' method of evaluating the issue.")

[69] *Padilla*, 130 S. Ct. 1473, 1481-1482 (2010).
[70] *Id.* at 1482.
[71] *Id.* at 1481-1482.
[72] *Id.* at p. 1483, n. 10 (emphasis added).
[73] *Id.* at p. 1487-1488 (Alito, J., concurring).
[74] *Id.* at p. 1494-1497 (Scalia, J., dissenting).
[75] *Id.* at 1481 (citing cases).

organizations."[76]  The two dissenting Justices opined that neither the Constitution nor *Strickland* supported the result reached in *Padilla*.[77]  The only consistent theme in the pre-*Padilla* precedent was that attorneys who failed to inform their clients of the deportation consequences of guilty pleas were rendering constitutionally effective assistance.

In reaching this conclusion regarding the pre-*Padilla* precedent, the Court notes the critical distinction between a change in the "prevailing professional norms" cited by the majority and a change in the controlling legal precedent.[78]  Although the majority in *Padilla* highlighted the link between prevailing professional norms and the reasonableness prong of *Strickland*,[79] it would be pure folly to erase the distinction between professional ideals and constitutional rights. The Sixth Amendment establishes a constitutional floor for effective assistance of counsel.[80]  An attorney, who only fulfilled his constitutional duties to his clients, and did no more, would be a poor attorney.  It is admirable that the defense bar daily provides assistance that far exceeds defendants' constitutional rights to counsel.  But this Court agrees with the concurrence in *Padilla* which stated, "[a]lthough we may appropriately consult standards promulgated by private bar groups, we cannot delegate to these groups our task of determining what the Constitution commands."[81]  Professional organizations may promulgate guidelines *ad nauseum*, but a professional guideline is *never legal precedent until it is adopted by courts*.  To be clear, every legal organization in the country could endorse a professional norm, but that alone would not create precedent dictating a particular result for the purposes of the *Teague* analysis.  In

---

[76] *Id.* at 1488 (Alito, J., concurring) (emphasis added).

[77] *Id.* at 1494-1495 (Scalia, J., dissenting).

[78] *See, id.* at 1482.

[79] *Id.*

[80] *See id.* at 1494 (Scalia, J., dissenting) ("In the best of all possible worlds, criminal defendants contemplating a guilty plea ought to be advised of all serious collateral consequences of conviction, and surely ought not to be misadvised. *The Constitution, however, is not an all-purpose tool for judicial construction of a perfect world*; and when we ignore its text in order to make it that, we often find ourselves swinging a sledge where a tack hammer is needed.") (emphasis added).

[81] *Id.* at 1488 (Alito, J., concurring) (citing Strickland v. Washington, 466 U.S. 668, 688 (1984)).

*Padilla* the Supreme Court broke with the overwhelming majority of *existing precedent* when it held that it is ineffective assistance of counsel to not inform a client of the deportation consequences of a guilty plea.[82]

Next, the Court considers the fact that two justices dissented in *Padilla*.[83] The Supreme Court has interpreted dissenting justices as evidence that reasonable jurists could disagree on a specific issue. Furthermore, the two concurring justices sharply disagreed with the majority about the scope of this newly announced requirement.[84] *Padilla* is a prime example of a situation where reasonable jurists could—and did—differ in their interpretation of precedent.

At the very least, all nine justices agreed that *Padilla* changed *the scope and the nature* of representation that attorneys are required to render. Furthermore, the fact that *Padilla* broke with a tremendous corpus of contrary precedent strongly indicates that reasonable jurists could reach a contrary conclusion. Moreover, it must be acknowledged that two justices dissented and the two concurring Justices would have severely limited *Padilla*'s holding. In light of these realities, this Court cannot find that *Padilla* was dictated by existing precedent such that reasonable jurists could not reach a different conclusion. *Padilla* announced a "new rule" under *Teague*, and the Court may not consider the merits of Santos-Sanchez' claim unless an exception applies.

### iii.    Whether *Teague's* Exceptions Apply

Generally, "new rules" under *Teague* may not be applied retroactively, but this principle is subject to two exceptions.[85] "'The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe, or addresses a substantive categorical guarante[e] accorded by the Constitution, such as a rule

---

[82] *Id.* at 1486.
[83] *Id.* at 1494-1497 (Scalia, J., dissenting).
[84] *Id.* at 1487-1494 (Alito, J., concurring).
[85] Beard v. Banks, 542 U.S. 406, 416-417 (2004).

prohibiting a certain category of punishment for a class of defendants because of their status or offense.'"[86]  The second exception allows retroactive application of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."[87]  The Court already concluded that *Padilla* announced a new rule.  As noted above, the fact that *Padilla* announced a new rule on collateral review necessitates that it be classified as a new rule exception.

The first *Teague* exception is concerned with substantive rules, not rules of criminal procedure.[88]  "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes."[89]  But, "rules that regulate only the *manner of determining* the defendant's culpability are procedural."[90]

In *Penry v. Lynaugh*,[91] the Supreme Court stated the following in its analysis of a potential new rule:

> Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits execution of mentally retarded persons such as Penry *regardless of the procedures followed*, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.[92]

The decision in *Padilla* is readily distinguishable from the situation in *Penry*, because the concern addressed in *Padilla* is remedied if the *proper procedures* are followed.  In other words, *Padilla* does not bar a lawfully present alien from pleading guilty to deportable offenses in all

---

[86] Graham v. Collins, 506 U.S. 461, 477 (1993) (quoting Saffle v. Parks, 494 U.S. 484, 494 (1990)) (citing Teague v. Lane, 489 U.S. 288, 311 (1989)).

[87] Saffle v. Parks, 494 U.S. 484, 495 (1990) (quoting Teague v. Lane, 489 U.S. 288, 311 (1989) (plurality opinion)) (citing Butler v. McKellar, 494 U.S. 407, 416 (1990)).

[88] Schriro v. Summerlin, 542 U.S. 348, 351-352 and n. 4 (2004) (citing Horn v. Banks, 536 U.S. 266, 271 and n. 5 (2002) (per curiam)) (noting that "[w]e have sometimes referred to rules of this latter type as falling under an exception to *Teague's* bar on retroactive application of procedural rules . . . they are more accurately characterized as substantive rules not subject to the bar.").

[89] *Id.* at 353 (citing Bousley v. United States, 523 U.S. 614, 620-621 (1998); Saffle, 494 U.S. at 495).

[90] *Id.* (citing Bousley, 523 U.S. at 620).

[91] Penry v. Lynaugh, 492 U.S. 302 (1989) (*abrogated on other grounds by* Atkins v. Virginia, 536 U.S. 304 (2002)).

[92] *Id.* at 330 (emphasis added).

cases, it merely requires an attorney to inform her client of the potential deportation consequences of a guilty plea if that client is otherwise unaware of those consequences. Therefore, the first *Teague* exception is inapplicable to the rule announced in *Padilla*.

When considering *Teague's* second exception, it would be difficult to over-emphasize how seldom it applies.  In *Graham*, the Supreme Court stated that such exceptions "'would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge.'"[93]  Furthermore, the Supreme Court has pointed to *Gideon v. Wainwright*,[94] as the prototypical example of a decision that implicates the second *Teague* exception.[95]  That is, of course, the case where the right to counsel was applied to the states.[96]  In light of this incredibly high threshold, it seems improper to consider *Padilla* holding to be a "watershed rule of criminal procedure."

The Court began the *Teague* analysis by explaining that the *Padilla's* unusual procedural posture required the rule announced there to be an old rule, or a new rule exception.  After conducting a thorough analysis, the Court finds that none of those options readily explain the outcome in *Padilla*.  This reality may explain the utter failure of the Supreme Court to address *Teague* in *Padilla*.[97]  The Court suspects that this omission was intentional because *Padilla's* holding could not be readily reconciled with the *Teague* framework.

Normally, the Court would be compelled to choose one of these unattractive options. However, that decision is unnecessary in this case because each of the available options requires

---

[93] Graham v. Collins, 506 U.S. 461, 478 (1993) (quoting Teague v. Lane, 489 U.S. 288, 313 (1989) (plurality opinion)).
[94] 372 U.S. 335 (1963).
[95] *See* Saffle v. Parks, 494 U.S. 484, 495 (1990); Beard v. Banks, 542 U.S. 406, 417 (2004).
[96] Gideon v. Wainwright, 372 U.S. 335 (1963).
[97] *Cf.*, United States v. Chaidez, 730 F. Supp. 2d 896, 903 (N. D. Ill., 2010) (noting that "[i]n Padilla, despite three separate opinions, no member of the Court even mentioned *Teague*....").

retroactive application of *Padilla* to cases on collateral review.[98]  Since *Padilla* itself was on collateral review and it both announced and applied its own rule, this Court is compelled to reach the merits of Santos-Sanchez' *Padilla* claim.[99]

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL ANALYSIS

Santos-Sanchez claims that he received ineffective assistance of counsel.  Under the pertinent two-prong test, Santos-Sanchez must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that Santos Sanchez suffered prejudice as a result.[100]  In assessing whether counsel was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance . . . ."[101]

In his *coram nobis* petition, Santos-Sanchez claims that he received inadequate advice regarding the immigration consequences of pleading guilty.[102]  This Court originally denied his petition.[103]  The Fifth Circuit remanded this case for consideration in light of *Padilla*.[104]  The Court will begin by reviewing the standard announced in *Padilla*.

The majority in *Padilla*, held that "counsel must inform her client whether his plea carries a risk of deportation."[105]  Elsewhere in its opinion, the majority provided more detail on this requirement:

---

[98] Danforth v. Minnesota, 552 U.S. 264, 266 n. 1 (2008) (quoting Penry v. Lynaugh, 492 U.S. 302, 313 (1989), *abrogated on other grounds by* Atkins v. Virginia, 536 U.S. 304 (2002)).

[99] The Court sincerely doubts that the current *Teague* framework is capable of explaining the *Padilla* decision. Justice Stevens suggested there was something truly unique about deportation. Therefore, the Court is left to speculate whether *Padilla* marked the announcement of a third "new rule" exception under *Teague* that applies exclusively to *Padilla's* holding because in the eyes of the majority, deportation is *sui generis*.

[100] Strickland v. Washington, 466 U.S. 668, 687-688 (1984).

[101] *Id.* at 689.

[102] Dkt. No. 1.

[103] Dkt. No. 19.

[104] Dkt. No. 40.

[105] Padilla v. Kentucky, 130 S. Ct. 1473, 1486 (2010).

Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward (as it is in many of the scenarios posited by Justice ALITO), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.[106]

Accordingly, general warnings about immigration consequences are sufficient in areas where the law is "unclear," but more specific advice is required where the law is "clear." The Court agrees with Justice Alito's assessment that "[t]his vague, halfway test will lead to much confusion and needless litigation."[107] Furthermore, this requirement of specific advice in certain situations is a departure from the general rule of *Ruiz v. United States*[108] where the Supreme Court stated that "the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor."[109] In *Padilla*, the Supreme Court departed from this general standard and carved out an exception for aliens who will clearly be deported.[110]

Next, the Court must determine whether Santos-Sanchez' situation merited general or specific advice regarding the immigration consequences of his guilty plea. Conveniently, the

---

[106] *Id.* at 1483.

[107] *Id.* at 1487 (Alito, J., concurring).

[108] 536 U.S. 622 (2002).

[109] *Id.* at 630 (citations omitted).

[110] Under *Padilla*, these aliens are entitled to a degree of specificity and accuracy in their counsel's advice regarding deportation consequences that citizens are not entitled to receive when their attorneys are advising them on other serious matters. For example, the Second Amendment gives a citizen the individual right to bear arms. This constitutional right is lost upon conviction of a felony, but attorneys are not required to advise of this consequence.

concurrence in *Padilla* gave examples of situations where the immigration laws are less than clear including deportation based on an "aggravated felony" or a crime "involving moral turpitude,"[111] and the majority appeared to agree with that characterization.[112]

Here, Santos-Sanchez pleaded guilty to 8 U.S.C. § 1325 and 18 U.S.C. § 2(a).[113] He was found deportable under 8 U.S.C. § 1227(a)(1)(E)(i).[114] The Court finds that this is a "clear" case because "[Santos-Sanchez'] counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal"[115] for alien smugglers who have been in the country fewer than five years and who are not smuggling certain immediate family members.[116]

According to Santos-Sanchez' attorney, she warned him that there was a "possibility that [he] may be deported . . . ."[117] While the Court maintains that this advice was not misleading,[118] it lacks the extreme specificity now required by *Padilla* in such a "clear" cases. Therefore, this advice fell below an objective standard of reasonableness, and the Court must now consider whether Santos-Sanchez was prejudiced by this advice.

"To prove prejudice for an ineffective assistance of counsel claim in the context of a guilty plea, the habeas petitioner must show that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'"[119] Santos-Sanchez claims that he would have not pleaded guilty if he had known that his guilty plea

---

[111] Padilla v. Kentucky, 130 S. Ct. 1473, 1488-1490 (2010) (Alito, J., concurring).

[112] *Id.* at 1483.

[113] Cr. Dkt. No. 2.

[114] Dkt. No. 1, Attach. 8.

[115] Padilla, 130 S. Ct. at 1483.

[116] 8 U.S.C. § 1227(a)(1)(E)(i) & (iii).

[117] Dkt. No. 1, Attach. 3.

[118] Dkt. No. 19.

[119] Bond v. Dretke, 384 F.3d 166, 167-168 (5th Cir. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

would result in his deportation.[120]  Due to the specific facts of Santos-Sanchez' case, the Court is

unconvinced by this assertion.  First, a decision to go to trial was not guaranteed to benefit

Santos-Sanchez either in his criminal case or in immigration proceedings.  Importantly, Santos-

Sanchez has never asserted that he is innocent of the underlying conduct.[121]  When that reality is

combined with the straight-forward facts of the case, it appears that a conviction at trial was very

probable.  Had he been convicted at trial, Santos-Sanchez would have then been facing

deportation, but only after serving a likely term of imprisonment.  Furthermore, even if he was

found not guilty at trial the government would have been free to institute removal proceedings

because the burden of proof is lower in the removal context.  Finally, Santos-Sanchez pleaded

guilty to a misdemeanor, but the underlying conduct he pleaded to would have supported a

felony indictment.  Thus, had Santos-Sanchez demanded a trial, it is very likely that the

government would have indicted him for a felony based on this conduct.  The reality in Laredo is

that cold pleas to misdemeanor conduct often reflect an offer of leniency by the government

hoping to induce a guilty plea.  If that tacit offer is rejected, the government often increases the

severity of the charge.

When the above factors are considered together, the Court finds that a defendant facing

that situation would be unlikely to demand a trial.  In other words, Santos-Sanchez has failed to

demonstrate a reasonable probability that he would have insisted on a trial if only his attorney

had properly informed him of the deportation consequences of pleading guilty.  The Court is

aware that this may appear to be a strange finding in light of the fact that Santos-Sanchez is now

seeking a trial.  But the circumstances changed drastically in the intervening years between

Santos-Sanchez' guilty plea and the filing of this current petition.  Most importantly, the material

---

[120] Dkt. No. 1 at p. 12.
[121] United States v. Gavilan, 761 F.2d 226, 229 (5th Cir. 1985) (*abrogated on other grounds by* Padilla v. Kentucky, 130 S. Ct. 1473 (2010)).

witness was no doubt released from custody within days of Santos-Sanchez' plea. On these facts, a request for a trial several years after pleading guilty is not indicative of what Santos-Sanchez would have done at the time of his plea. The Court finds that Santos-Sanchez was not prejudiced by his attorney's failure to tell him that he was facing near certain deportation.[122]

Because Santos-Sanchez' was not prejudiced by his attorney's unreasonable performance, his claim of ineffective assistance of counsel falls short. Furthermore, even if Santos-Sanchez could demonstrate prejudice, the Court is convinced that the facts of this case do not entitle Santos-Sanchez to *coram nobis* relief. Out of an abundance of caution, the Court will explain why the facts of Santos-Sanchez' case do not merit *coram nobis* relief.

## IV.   WRIT OF CORAM NOBIS

"'The writ of *coram nobis* is an extraordinary remedy . . . .'"[123] The writ is available to a petitioner no longer in custody seeking to vacate a criminal conviction.[124] To prevail a petitioner must "'demonstrate civil disabilities as a consequence of the criminal conviction, and that the challenged error is of sufficient magnitude to justify the extraordinary relief.'"[125]

In considering Santos-Sanchez' *coram nobis* petition, the Court is acutely aware that "courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases."[126] Although the Fifth Circuit has acknowledged the "rigorous standards" of *coram nobis*, ineffective assistance of counsel was thought to automatically satisfy those standards.[127] This approach is foreclosed by recent Supreme Court precedent. In *United States v. Denedo*, the

---

[122] Even Santos-Sanchez admits that deportation is never certain. *See* Dkt. No. 52 at p. 6, n. 6.
[123] United States v. Esogbue, 357 F.3d 532, 534 (5th Cir. 2004) (quoting Jimenez v. Trominski, 91 F.3d 767, 768 (5th Cir. 1996)).
[124] *Id.* at 534.
[125] *Id.* (quoting Jimenez, 91 F.3d at 768).
[126] United States v. Denedo, 129 S. Ct. 2213, 2224 (2009).
[127] United States v. Castro, 26 F.3d 557, 559 (5th Cir. 1994).

Supreme Court, noting that *coram nobis* "'should not be granted in the ordinary case[,]'"[128] remanded a *coram nobis* for consideration on the merits.  The Supreme Court instructed the lower court to consider, among other things, "[t]he relative strength of respondent's ineffective-assistance claim . . . ."[129]  An inquiry into the relative strength of an ineffective assistance of counsel claim would have been wholly unnecessary if a showing of ineffective assistance of counsel automatically entitled a defendant to *coram nobis* relief.  Therefore, the Court will evaluate the relative strength of Santos-Sanchez' ineffective assistance of counsel claim.

Here, assuming that Santos-Sanchez' had been able to demonstrate prejudice, the Court is convinced that Santos-Sanchez' claim of ineffective assistance of counsel is relatively weak.

First, this is not a case where the defendant was wholly unaware of the possibility of deportation.  Santos-Sanchez attorney told him there was a possibility that he would be deported.  This was accurate, if insufficient, advice under *Padilla*.  Furthermore, this is not a case where there was an affirmative misrepresentation regarding deportation consequences.  In evaluating the relative strength of Santos-Sanchez' ineffective assistance of counsel claim, the fact that he has never asserted his innocence makes his claim of ineffective assistance of counsel less severe.

The relative weakness of Santos-Sanchez claim may be further illustrated by comparing it with another case.  In *United States v. Castro*,[130] defense counsel neither informed Castro about a judicial recommendation against deportation ("JRAD"), nor requested one from the court at sentencing.[131]  In *Castro*, the defendant had everything to gain and nothing to lose from requesting JRAD relief.  In contrast, Santos-Sanchez had much to lose if he opted to go to trial.  If convicted, he would have served prison time instead of probation.  In the Laredo Division, he

---

[128] 129 S. Ct. 2213, 2224 (2009) (quoting Nken v. Holder, 129 S. Ct. 1749, 1762 (2009) (Kennedy, J., concurring)).
[129] *Id.*
[130] United States v. Castro, 26 F.3d 557 (5th Cir. 1994).
[131] *Id.* at 558-559.

may have faced a felony indictment if he had pleaded not guilty to the misdemeanor charge. Furthermore, as explained above, he would have likely been facing removal whether or not he was found guilty of criminal charges. Therefore, the facts of Santos-Sanchez case are less egregious than those encountered in *Castro*.

The facts of Santos-Sanchez' case do not support a finding that he suffered a complete miscarriage of justice. Therefore, even assuming that Santos-Sanchez had been able to demonstrate that he received ineffective assistance of counsel, he is not entitled to *coram nobis* relief.

## V.    CONCLUSION

In accordance with Fifth Circuit precedent, the Court has analyzed whether Santos-Sanchez should retroactively receive the benefit of *Padilla* under *Teague*. Because *Padilla* was decided on collateral review, the only outcome still available under a *Teague* analysis requires retroactive application of *Padilla*. The Court applies *Padilla* to the facts of Santos-Sanchez' case and has determined that he received effective assistance of counsel. Alternatively, the Court finds that Santos-Sanchez has failed to demonstrate a complete miscarriage of justice entitling him to relief on a writ of *coram nobis*. Accordingly, the Court **DENIES** his petition for writ of *coram nobis*.

IT IS SO ORDERED.

DONE this 24th day of August, 2011, in McAllen, Texas.

_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE